E-FILED
Wednesday, 21 May, 2008  02:13:57 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS – SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BRADLEY   KNUCKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3240 |
| | ) | |
| MICHAEL  J.  ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

CHARLES  H.  EVANS, U.S. Magistrate Judge:

Plaintiff Bradley Knuckey appeals from a final decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) and Supplemental Social Security Income (SSI) under chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1381a.   Knuckey brings this appeal pursuant to 42 U.S.C. § 405(g).   The parties have consented to a determination of this case by the United States Magistrate Judge, pursuant to 28 U.S.C. § 636. <u>Order entered July 9, 2007 (d/e 14)</u>. The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule

8.1(D). <u>Motion for Summary Judgment (d/e 12)</u>; <u>Motion for Summary Affirmance (d/e 16)</u>. For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence. The SSA's Motion for Summary Affirmance therefore is allowed, and Knuckey's Motion for Summary Judgment is denied.

## FACTS

Knuckey applied for DIB and SSI on August 20, 2003. He alleged that a back injury he suffered in January of 1998 made it impossible for him to work. The SSA denied his claims initially and on reconsideration. Knuckey requested a hearing, which was held March 29, 2006. On April 24, 2006, an Administrative Law Judge (ALJ) issued a decision denying Knuckey's application. The Appeals Council denied Knuckey's request for review, and Knuckey now seeks judicial review.

A. <u>Medical History</u>

For more than 20 years, from 1977 to 1998, Knuckey worked as a pipefitter. On January 23, 1998, when Knuckey was 41, he suffered a back injury on the job, and three days later, his

construction company laid him off. Knuckey never worked as a pipefitter again.

In February of 1998, Knuckey visited a Dr. David Fletcher, who diagnosed him with a multi-level disc herniation and severe degenerative disc disease. Fletcher considered Knuckey a potential surgery candidate and advised Knuckey that he would need a job change. He also recommended that Knuckey walk and referred him to physical therapy.

Knuckey attended a follow-up visit with Dr. Fletcher six months later. Dr. Fletcher noted that Knuckey had made a good effort at physical therapy but believed he had "maxed out." R.333. Dr. Fletcher requested a functional capacity evaluation for Knuckey, but he also advised that no "further medical treatment will benefit him." Id. Dr. Fletcher opined that Knuckey had "a lot of skills to make himself more gainfully employable." Id.

On July 20-21, 1998, Knuckey underwent the functional capacity evaluation Dr. Fletcher recommended. His physical therapists did not believe he was motivated to return to work, and they believed that the functional levels they observed during the evaluation were lower than those he exhibited in a work hardening program a week

earlier.  After this evaluation, both Knuckey's physical therapists  and  Dr. Fletcher  concluded  that  Knuckey  was  employable.

In September of 1998,  Dr. Fletcher  recommended  that  Knuckey visit a Dr. Terrence Pencek  for  treatment  of  his  continuing  back pain.   At an October 12, 1998 appointment, Dr. Pencek recommended  that Knuckey  wear  a  brace  but  stated  that  it  was possible  that  Knuckey would  need  a  discogram.     Five  months  later, Knuckey  returned  for a  follow-up  visit  with  Dr . Pencek  and  told  him that  the  brace  had not  helped.      Dr.  Pencek  recommended  an  interbody  fusion  of Knuckey's  L4,  L5,  and  S1  vertebrae.

Knuckey  underwent  the  interbody  fusion  May  27, 1999.     Dr. Pencek  and  a  Dr.  John  Trost  removed  several  discs  and  fused titanium  implants.     On  October  25, 1999,  in  a  follow-up  visit,  Dr. Pencek  observed  that  Knuckey  was  "ambulating  well"  and  advised that  Knuckey  "could  return  to  work  type  activities."  R.226.     Around the  same  time,  Dr.  Fletcher  noted  that  Knuckey  was  doing  well  and had  denied  any  leg  pain  or  numbness.

At  the  request  of  a  state  agency,  Dr.  Vittal  Chapa  examined Knuckey  on  February  16,  2000.     He  observed  that  Knuckey  could

bear weight and "ambulate without any ambulatory aide." R.245. Dr. Chapa also observed, however, that Knuckey had decreased range of motion in his spine, had to turn on his side to lie down, had sluggish ankle reflexes, exhibited evidence of severe paravertebral muscle spasms, and appeared to be in moderate to severe pain.

On February 24, 2000, another state agency physician, Dr. Clement Gotway, reviewed Knuckey's records and opined that Knuckey could stand or walk for 6 hours in an 8-hour workday; occasionally climb, stoop, kneel, crouch, or crawl; frequently push, pull, or lift 10 pounds; and occasionally push, pull, or lift 20 pounds.  Dr. Gotway opined that Knuckey did not need assistance to walk.

In July 2001, Knuckey began working for a construction company, essentially as a handyman.  In September 2001, however, he quit this job. According to Knuckey, his pain made it impossible for him to continue working.

Two years later, on July 24, 2003, Knuckey saw neurologist Dr. Awais Riaz after experiencing an apparent seizure.  Dr. Riaz found that Knuckey's seizure could have been a generalized tonic clonic seizure but also opined that it may have been an alcohol withdrawal seizure related to Knuckey's

3:06-cv-03240-CHE   # 18   Page 6 of 27

daily 6- to 12-can beer consumption.  At this appointment, Knuckey told Dr. Riaz that he also smoked between one and two packs of cigarettes a week.  Dr. Riaz concluded that in other respects, Knuckey was normal:  his mental status, deep tendon reflexes, coordination, and gait were all "normal."  R.260.  Knuckey also had normal reactions to pinpricks, soft touch, vibration, and proprioception, and he was able to walk on his heels and toes, tandem walk, and stand with his feet together.

Several weeks later, on August 12, 2003, Knuckey again visited Dr. Riaz.  Knuckey's fiancee told the doctor that a few days before, she had witnessed Knuckey experiencing what she thought was another seizure.  Dr. Riaz prescribed Carbatarol, an anti-seizure medication and told Knuckey that alcohol consumption would adversely affect his medication and his seizure propensity.  Knuckey told Dr. Riaz that he was willing to check into a detox program.  It is not clear from the record whether he actually did.

Five weeks later, Knuckey underwent another consultative examination with Dr. Chapa.  At this examination, Knuckey walked with a cane and told Dr. Chapa that sometimes he could not walk without it.  He also stated that he could not concentrate and needed to nap every hour.  Knuckey said he did not smoke and had no history of alcohol abuse.  Dr.

Chapa noted several abnormal conditions: limited range of motion of the lumbosacral spine, cervical spine, and both shoulders and paravertebral muscle spasms. He noted that these findings were subjective, however.

On October 3, 2003, another state agency physician, Dr. Charles Kenney, examined Knuckey's records and discounted his "alleged use of [a] cane," concluding that Knuckey likely could walk 50 feet unassisted. R.268-69. His assessments of Knuckey's abilities to stand or sit in an 8-hour day and push, pull, or lift weight matched Dr. Gotway's previous findings.

On November 11, 2003, Knuckey again visited Dr. Fletcher. At this appointment, Dr. Fletcher noted that Knuckey' back pain had increased and he had developed right arm and neck pain. Dr. Fletcher also observed an extremely limited range of motion of the cervical spine but no significant tenderness. He recommended X-rays to evaluate the neck pain, use of an anti-inflammatory and a home exercise program, and suggested that Knuckey apply for disability benefits.

Several months later, Dr. Fletcher completed paperwork for Knuckey's disability application. On February 12, 2004, he wrote a letter to the Illinois Department of Human Resources in which he opined that Knuckey's "ability to work is certainly restricted," and he "is not gainfully employable."

R.278.  He also stated that Knuckey suffers from chronic pain syndrome, but it is not clear from the record when Dr. Fletcher diagnosed Knuckey with this condition.  Subsequently, on May 3, 2004, Dr. Fletcher stated that Knuckey could walk unassisted.

On May 25, 2004, Dr. Fletcher prescribed Oxycontin for Knuckey's neck and lower back pain.  He also scheduled Knuckey for an MRI, which showed no definite focal abnormality or seizure focus.  Dr. Fletcher noted no obvious neurological deficits.

On July 19, 2004, for the first time in the record, Dr. Fletcher noted that Knuckey "has some features of fibromyalgia."  R.377.  On August 20, 2004, he stated that he had filled out some paperwork for Knuckey and concluded that Knuckey was "disabled from work."  R.375.  On September 2, 2004, he stated, "Once again I'm concerned about some fibromyalgia components to the problem."  R.374.   In a visit on December 13, 2004, Dr. Fletcher again noted that Knuckey "has features of fibromyalgia or myofascial pain."  R. 372.  A month later, he stated that Knuckey exhibits several trigger points consistent with fibromyalgia.   In this visit, Knuckey complained of "increased difficulty doing practically anything." R. 369.  Dr. Fletcher thought he was depressed.

On May 20, 2005, Dr. Fletcher increased Knuckey's Doxepin prescription.  He assessed Knuckey with depression, fibromyalgia, chronic low back pain, and prostatitis.  He also noted that Knuckey had been walking.  On August 15, 2005, however, Dr. Fletcher noted that Knuckey had gone through more than the prescribed dosage of the painkiller Oxycontin in a month and cautioned him against such behavior.

In December of 2005, Dr. Fletcher completed another state agency form regarding disability.  He noted that Knuckey is "ambulatory," capable of "clerical administrative" work, able to function in stressful situations, and able to engage in interpersonal relations.  R.357-58.  He concluded, however, that Knuckey is "totally disabled from any occupation."  R.359.

B.    Administrative Hearing

Knuckey testified at an administrative hearing in his case on March 29, 2006.  He was 49.  Knuckey had a GED and could read and write English without problem.  Knuckey informed the ALJ that he lived with his girlfriend and spent most of his time in the basement of their home.  He had no current sources of income; his girlfriend supported him.  In 1998, he received a $100,000.00 worker's compensation lump sum settlement.

Knuckey last worked in 2001; that year, he worked in construction for

almost four months.  He testified that he quit because he was not physically capable of performing the work, which required heavy lifting and a lot of walking.  He informed the ALJ that significant pain in his back, legs, feet, arms, neck, and face, plus other fibromyalgia symptoms, keep him from working now.

According to Knuckey, some of the pain medications he has taken were quite effective, but he can no longer afford them.  His fibromyalgia medication helps, however.  The only side effect Knuckey reported was a tendency to sleep a lot.  He added that his depression also might cause him to sleep a lot, though.

Knuckey brought a cane to the hearing.  When the ALJ asked him to walk without it, he took several steps but said he could not walk farther because of severe back pain.  Knuckey also testified that his pain makes it impossible for him to sit for more than 15 to 20 minutes; similarly, he can only stand for 15 to 20 minutes at a time.  Generally, he spends most of the day lying on his back in his recliner.  He thought he could alternate sitting and standing for about an hour, but then he'd have to lie down.  Every Sunday, however, he attends church.  "Most times" he is able to make it through the hour-long service.  R.43.  On his better days, Knuckey can cook

short meals and do small amounts of laundry.  Yet, he needs help getting dressed sometimes and cannot reach his feet.  He testified that he cannot vacuum or grocery shop.

The ALJ elicited a number of inconsistencies from Knuckey at the hearing.  First, Knuckey denied filing a prior disability application in July of 1976 and indicated that his application in August of 1999 was "the original Social Security application for this case."  R.33.  The record demonstrates that Knuckey did file two prior applications however.

Second, Knuckey testified that he had not consumed alcohol for four years and denied that he ever had a problem.  He said he quit because alcohol no longer appealed to him.  He admitted that he attended a detox program, but indicated that it was related to his DUI conviction, which he received in the late 1980s.  Knuckey stated that he never drank after that, but he maintained that he never believed he had a problem.

Third, Knuckey stated that he smoked, but said he quit in about 1990 and did not smoke again for 10 years.  He stated that any contradiction in the record regarding his smoking status in 2003 could be attributed to a poor memory.

Vocational expert Bonnie Gladden also testified at the hearing.  The

ALJ asked her to consider an individual with limited to light work ability and occasional postural limits. Gladden testified that Knuckey's skills would not transfer into that type of work. Given such restrictions, an individual could not perform Knuckey's previous jobs. Such an individual could, however, perform the job of gate tender, of which there are 8,200 in Illinois. She noted that a gate tender must be able to sit for the majority of the day. Gladden also testified that an individual with the described limitations could perform assembly work of small products and that 31,300 such jobs exist in Illinois. Of those, 7,100 are sedentary assembly jobs. Gladden testified that these jobs are only representative of the jobs such an individual could perform; others likely exist.

The ALJ then asked Gladden to modify the hypothetical and consider an individual who could perform only sedentary work with a sit/stand option. Gladden stated that the gate tender job would still be available, as would cashier work. At the sedentary level, 7,000 cashier jobs exist in Illinois. Again, these jobs are all representative. Gladden noted, however, that even these sedentary jobs could not be performed lying down.

Finally, the ALJ asked Gladden to consider an individual who would miss four or more days of work a month because of pain. Gladden thought

12

such an individual would not be able to find employment.

C.    The ALJ's Decision

The ALJ concluded that Knuckey was not disabled under the Social Security Act and issued his decision on April 24, 2006.  In reaching this decision, the ALJ followed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920.  The analysis requires a sequential evaluation of (1) whether claimant is engaged in substantial gainful activity; (2) the severity of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and past work experience.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

First, the ALJ determined that Knuckey has not engaged in substantial

gainful activity since he stopped work January 26, 1998. The ALJ found the Knuckey "less than credible" regarding his assertion that his impairments made it impossible for him to continue working at the handyman job he quit after less than four months in 2001, however.  Second, the ALJ found that Knuckey suffers from the following severe impairments:  fibromyalgia, prostatitis, and a history of lumbar fusion.  Third, the ALJ concluded that Knuckey does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ based his evaluation of Knuckey's impairments exclusively on information obtained from health care professionals, and he explained that he afforded little weight to opinions based on Knuckey's subjective reports of his conditions.  Fourth, the ALJ found that Knuckey can no longer work as a pipefitter, his previous employment.  He concluded that Knuckey can lift no more than 20 pounds at a time but can frequently lift or carry objects weighing up to 10 pounds and occasionally climb, balance, stoop, kneel, crouch, or crawl.  Fifth, the ALJ found that given Knuckey's residual functional capacity, age, education, and past work experience, he can perform other work.  Based on the vocational expert's testimony, the ALJ found that Knuckey can work as gate tender or assembly worker.  The

ALJ held that Knuckey can perform a significant number of jobs in the national economy and therefore is not disabled.

In conducting his analysis, the ALJ provided Knuckey's own reports of pain and limitation little to no weight.  He concluded that Knuckey's reports "were not fully credible as they were not supported by the medical evidence or relevant credibility factors."  R.23.  For example, the ALJ noted, while Knuckey told Dr. Fletcher in November of 2003 that he had developed increased back, neck, and right arm pain, Dr. Fletcher recommended only an anti-inflammatory and a home exercise program.

In July of 1998, when Knuckey underwent a functional capacity evaluation, his physical therapists noted that Knuckey exhibited lower functional levels than he had just demonstrated in a work hardening program the prior week and concluded that Knuckey was not motivated to perform to his highest capacity.  The ALJ also noted that Knuckey had very poor attendance at physical therapy appointments, and Knuckey testified that he could not do the home exercise programs prescribed.

Similarly, while Knuckey insisted he needed a cane to walk, numerous subsequent records noted that he could walk without assistance.  In October of 2003 a state agency physician specifically discounted any need for a cane.

15

In his decision, the ALJ also included a lengthy analysis of his assessment of Knuckey's general credibility:

> When asked about filing prior applications for disability, the claimant denied doing so.  When confronted with the 1976 and 1999 applications he claimed no recollection at all  of any 1976 application and stated that the 1999 application was the "original" for the present action.  The claimant stated that he had not consumed any alcohol for four years now and that he never had any real problem with the abuse of alcohol.  However, Exhibit 6F at page 2 clearly states that he was still drinking at that time (August 12, 2003) and he promised to go through a detoxification program. The claimant told the consultative examiner, on September 17, 2003, that he had no history of alcohol abuse (Exhibit 7F). When confronted with this conflict he had no real explanation. As stated, he promised a doctor he would go through a detoxification program. When the undersigned asked if the claimant had followed through on his promise, the claimant stated that he had not had a drink since.  When pressed, he said the detoxification program was part of his DUI sentence. However, his DUI was in the late 1980's.  Based on the above, the undersigned finds the claimant lacks credibility and, therefore, his testimony is afforded very little, if any weight.  In addition, the undersigned finds that the claimant most likely lacked credibility in the subjective information he provided to his physicians.  Therefore, the undersigned affords very little weight to the opinions of any health  care professionals whose conclusions were based on the claimant's subjective statements to them.

R.21.

Moreover, the ALJ found that Dr. Fletcher's opinions were internally inconsistent.  The ALJ noted that while Dr. Fletcher found Knuckey capable

of clerical administrative activity, able to function in high stress situations, and able to engage in most interpersonal relations with only slight limitations, he concluded that Knuckey is totally disabled from any occupation. Further, the ALJ noted that Dr. Fletcher's opinion of Knuckey's ability to work was based more on subjective reports of pain than on objective findings.

D.    The Appeals Council

On August 17, 2006, the Appeals Council denied Knuckey's request for review of the ALJ's decision. Knuckey argued that the ALJ should not have discredited his testimony because his doctors had not prescribed the use of a cane; Knuckey indicated he did not always need a cane. Additionally, Knuckey argued that the "date and source of the judgment's functional capacity is not clear." R.401. He asserted that he was never evaluated as able to occasionally climb, balance, stoop, kneel, crouch, or crawl. R.401.

Finally, Knuckey argued that the ALJ improperly discredited Dr. Fletcher's credentials and diagnosis. He provided a November 4, 2003 report from a Dr. Trudeau to bolster Dr. Fletcher's opinion. Dr. Trudeau's report indicates that "Dr. Fletcher is a nationally recognized specialist in his

field and Dr. Fletcher wants to do what is best for Mr. Knuckey." R.403. Dr. Trudeau states that Mr. Knuckey "sounds like a very classic case of fibromyalgia, and that's what Dr. Pencek and other physicians have suspected." Knuckey also submitted medical records from the Springfield Clinic for visits from 1988 through 1994. The records reflect a prompt care visit on January 31, 1998, but include no details.

The Appeals Council concluded that Knuckey's evidence did not merit a reversal. It found that the information Knuckey submitted did not provide a basis for overturning the ALJ's decision.

## ANALYSIS

Knuckey now asks this Court to find him disabled or remand to the ALJ for further consideration. Knuckey argues that the ALJ did not properly analyze whether he suffers from a fibromyalgia-related disability because he failed to afford Dr. Fletcher's opinions sufficient weight and because he insufficiently articulated his assessment of Knuckey's own credibility.

The Court reviews the ALJ's decision to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court

must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.   Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Knuckey argues that the ALJ failed to analyze his complaints of fibromyalgia-related disability properly.  Fibromyalgia is an "elusive and mysterious[] disease" that afflicts its sufferers with "pain all over," fatigue, disturbed sleep, stiffness, and tender spots in at least 11 of 18 fixed locations on the body.  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).  Because its symptoms are entirely subjective, assessment of the condition under disability law is challenging.  "Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not . . . ."  Id. at 307.   The ALJ determined that Knuckey was not among the minority.

Knuckey argues that the ALJ "totally disregards the diagnosis of Fibromyalgia and did not discuss the standard of testing for Fibromyalgia,

which involves testing for tenderness in focal points and ruling out other conditions," but he is incorrect.  <u>See</u> <u>Motion for Summary Judgment</u>, ¶ 3. The ALJ found that Knuckey "has severe fibromyalgia . . . but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." R.22-23.  The ALJ's failure to discuss the focal point testing and process of ruling out other conditions is irrelevant because he concluded that Knuckey does in fact suffer from fibromyalgia.  With that determination made, the issue was whether Knuckey's fibromyalgia disabled him.

Knuckey argues that the ALJ's conclusion that his fibromyalgia did not disable him was flawed because the ALJ improperly disregarded Dr. Fletcher's opinion of his ability to work and his own reports of pain.  The Court disagrees.

First, the ALJ's decision to discount Dr. Fletcher's opinion was not error.  "A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1177 (7th Cir. 2001).  Yet, the SSA Commissioner, not a doctor selected by the claimant, decides whether the claimant is disabled.   20 C.F.R. §

404.1527(e)(1).  A treating physician's statement about the effect of a claimant's symptoms on his ability to work does not alone establish that a claimant is disabled.  <u>Dray v. R.R. Retirement Bd.</u>, 10 F.3d 1306, 1311 (7th Cir. 1993).  An ALJ is required to consider such statements, but not to accept them.  20 C.F.R. § 404.1529.  An ALJ may discount the medical opinion of a treating physician where the opinion is internally inconsistent or inconsistent with other evidence.  <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995).

Here, the ALJ discounted Dr. Fletcher's opinion based on perceived inconsistencies in Dr. Fletcher's reports.  The Court agrees that Dr. Fletcher's opinions were internally inconsistent.  His finding that Knuckey could perform clerical administrative work and function interpersonally and under stress conflicts with his conclusion that Knuckey is totally disabled from any occupation.  Moreover, no other physician found Knuckey completely disabled.  Dr. Kenney and Dr. Gotway both opined that Knuckey could stand or walk for 6 hours in an 8-hour workday; occasionally climb, stoop, kneel, crouch, or crawl; frequently push, pull, or lift 10 pounds; and occasionally push, pull, or lift 20 pounds.  Their findings are inconsistent with Dr. Fletcher's conclusion that Knuckey's pain makes him

totally unable to work.  Thus, the Court finds no error in the ALJ's decision to discount Dr. Fletcher's assessment of Knuckey's disability.

Second, the ALJ's view of Knuckey's own testimony that the severity of his pain prevents him from functioning was not error.  Ordinarily, the reviewing court defers to an ALJ's credibility determination.  <u>Indoranto v. Barnhart</u>, 374 F.3d 470, 474 (7th Cir. 2004).  Absent legal error, an ALJ's credibility finding will not be disturbed unless "patently wrong."  <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000).

Here, the ALJ addressed a number of factors unrelated to Knuckey's reports of pain that made him suspicious of Knuckey's general truthfulness. He discussed Knuckey's inconsistent statements regarding alcohol consumption and noted that while Knuckey admitted he promised to attend a detoxification program, Knuckey claimed the issue arose after his DUI conviction in the 1980s, not after his seizures in 2003.  The ALJ also pointed out that Knuckey denied filing a 1976 disability application. Knuckey argues that these inconsistencies were merely memory lapses that may have been side effects of the Doxepin he was prescribed for depression. This argument is entirely hypothetical, however.  The record contains no evidence of prior reported memory lapses and no evidence that any treating

or examining physicians thought the Doxepin might have been interfering with Knuckey's mental abilities.  In fact, Knuckey told the ALJ that the only side effect of his medication was a tendency to sleep a lot but that his depression also might produce this result.

The ALJ additionally expressed specific concern regarding Knuckey's truthfulness in response to questions on his subjective experience of pain. An ALJ cannot disregard a claimant's subjective complaints merely because they are not fully supported by objective medical evidence, but he may discount subjective complaints that are inconsistent or that conflict with the evidence as a whole.  <u>Knight</u>, 55 F.3d at 314.  When assessing a claimant's credibility, an ALJ must consider the degree to which the claimant's allegations of pain and other symptoms are consistent with medical signs, laboratory findings, diagnoses, and opinions by treating or examining physicians; the ALJ also must explain adequately the reasons behind his credibility finding.  <u>See</u> <u>Brindisi ex rel. Brindisi v. Barnhart</u>, 315 F.3d 783, 787-88 (7th Cir. 2003).  Moreover,

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its

23

> effects to the claimant.   She must investigate all avenues
> presented that relate to pain, including claimant's prior work
> record information and observations by treating physicians,
> examining physicians, and third parties.  Factors that must be
> considered include the nature and intensity of claimant's pain,
> precipitation and aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for the relief of pain,
> functional restrictions, and the claimant's daily activities.

Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994).  If the ALJ provides

specific reasons supported by the record for his credibility finding, the court

must affirm it.  Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).

Preliminarily, the ALJ recognized no objective medical evidence of

disabling pain.  Knuckey argues that Dr. Chapa's reports include such

evidence, but as the ALJ noted, Dr. Chapa specifically indicated that his

limitation of motion tests were necessarily subjective because they depend

on the claimant's cooperation and motivation for an accurate assessment.

Finding no objective evidence to support a finding of disabling pain, the ALJ

appropriately assessed a list of subjective factors.

Knuckey argues that the ALJ failed to explain why he rejected

Knuckey's subjective reports of pain, but the ALJ included a detailed

explanation of specific factors in the record that support his finding.  He

noted that in a 1998 functional capacity evaluation, Knuckey claimed he

could not function at the level he had exhibited just the week before, and his therapists expressed doubt regarding his motivation. In 2003, he complained of severe back, neck and arm pain, but his treating physician thought his pain called for only an anti-inflammatory and home exercise program. On numerous occasions over the years, several different doctors, including Knuckey's own treating physician, noted that Knuckey was ambulatory and could walk unassisted, but he told the ALJ that he cannot take more than a few steps without a cane.

Moreover, at the Administrative Hearing, the ALJ obtained detailed descriptions of Knuckey's daily life. He learned that Knuckey spends most of his time in a recliner, but that he occasionally cooks dinner and does laundry. Knuckey told the ALJ that he could alternate sitting and standing for about an hour, but could not stay in one position that long. Yet, Knuckey testified that he attends church every Sunday and "most times" can get through the hour-long service. Knuckey also told the ALJ that he has trouble getting dressed sometimes and that he smokes but does not drink. The ALJ questioned Knuckey about his work experience in 2004 but noted in his Opinion that he did not consider this an unsuccessful work attempt. The ALJ also questioned Knuckey regarding the effectiveness of

his pain relievers, and Knuckey told him that the more expensive medication, which he could no longer afford, worked quite well.  He also testified that his fibromyalgia-specific medication helps.  Finally, the ALJ noted that Knuckey often missed physical therapy appointments and failed to follow an at-home exercise program.

While the ALJ did not discuss all of this information in his Opinion, he is not required to analyze every piece of evidence.  See Diaz, 55 F.3d at 308.  The Court does not consider this evidence so probative of Knuckey's disability that a failure to discuss it makes it impossible to track the ALJ's analysis.

Finally, Knuckey criticizes the ALJ for failing to apply the Sixth Circuit's test for evaluating complaints of disabling pain.  Under this test, an ALJ first must ask whether objective medical evidence confirms the severity of the alleged pain or the objectively established condition is of such severity that it can reasonably be expected to produce disabling pain.  See Felisky v. Bowen, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  Then, if the ALJ recognizes such an impairment, he must evaluate its intensity, persistence, and limiting effects.  Id. at 1039-40.  The ALJ here did not specifically reference this test, but the above discussion demonstrates that his analysis

encompassed it.   The ALJ applied the proper framework in analyzing Knuckey's complaints of pain.

THEREFORE, Knuckey's Motion for Summary Judgment (d/e 12) is DENIED, and Defendant's Motion for Summary Affirmance (d/e 16) is ALLOWED.   This case is closed.   All pending motions are denied as moot.

ENTER:   May  21,  2008.

FOR THE COURT:


_____s/ Charles H. Evans_____
CHARLES H. EVANS
UNITED STATES MAGISTRATE JUDGE